IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(SOUTHERN DIVISION)

| | |
|---|---|
| RENA NAYANTARA D'SOUZA<br>8009 Kentbury Drive<br>Bethesda, Maryand 20814,<br><br>    *Plaintiff*,<br><br>    v.<br><br>XAVIER BECERRA, SECRETARY,<br>DEPARTMENT OF HEALTH AND HUMAN<br>SERVICES<br>200 Independence Avenue S.W.<br>Washington D.C. 20201,<br><br>    *Defendant*. | Civil Case No.: 8:23-cv-02517 |

## COMPLAINT

Plaintiff, Dr. Rena Nayantara D'Souza, hereby sues Defendant, Xavier Becerra, Secretary, Department of Health and Human Services (hereinafter "the Agency"). Dr. D'Souza alleges discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e-5(f) though (k) and 2000e-16(c), based on race (Asian), sex (female), national origin (Asian, Indian), and color (brown). In support, Dr. D'Souza states as follows:

### JURISDICTION

1. This action arises under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e *et seq.*, which prohibits discrimination based on, *inter alia*, gender, national origin and color.

2. The Jurisdiction of this Court is based upon 28 U.S.C. §1331 relating to "any civil action or proceeding arising under any Act of Congress regulating commerce."

**VENUE**

3. Defendant is the head of a governmental unit of the United States that does business in Maryland. Dr. D'Souza worked in Maryland at the headquarters of the National Institutes of Health ("NIH") and all discriminatory acts took place in Montgomery County, Maryland which is within this judicial district and the southern division of this district.

4. Therefore, venue is proper in Maryland pursuant to 28 U.S.C. § 1391.

**STATEMENT OF FACTS**

5. Dr. D'Souza is a brown-skinned female, whose national origin is Indian. She was born and raised in Mumbai, India and is highly accomplished and well-educated.

**DR. D'SOUZA'S EXEMPLARY QUALIFICATIONS**

6. Dr. D'Souza received her Bachelor of Dental Surgery from the University of Mumbai (formerly known as the University of Bombay) in 1977. From 1978 to 1979 (after emigrating to the United States), Dr. D'Souza was a research associate at Columbia University in New York. From 1979 to 1981, she was a graduate Teaching Assistant and Resident Pathologist at the University of Texas Science Center in Houston ("UTHSC").

7. Dr. D'Souza continued her studies at UTHSC and in 1985 received a Doctor of Dental Surgery degree and in 1987 a PhD in Pathology/Biomedical Sciences. While pursuing her dental degree and PhD, and after attaining those degrees, Dr. D'Souza was Assistant Professor in UTHSC's Department of Anatomical Sciences (1985 to 1989). And, from 1989 to 1995, Dr. D'Souza was a full-time Assistant Professor in UTHSC's Department of Basic Sciences and Anatomical Sciences.

8. Dr. D'Souza became a tenured professor at UTHSC in 1995 and held that position until 2006, when she left UTHSC for another tenured faculty position at Baylor College of

Dentistry, Texas A&M Health Science Center ("A&MHSC"), Dallas, which she held until 2013, when she left A&MHSC for another tenured faculty position.

9. From 2013 to 2020, Dr. D'Souza served as Dean and tenured professor of Dentistry with an endowed Chair at the University of Utah's new School of Dentistry. While in that position, Dr. D'Souza simultaneously served as Assistant Vice President for Academic Affairs and Education, Health Sciences.

10. Dr. D'Souza also served in high-profile leadership positions including as the American Association for Dental Research's forty-first President (2012 to 2014) and as the International Association for Dental Research's ninety-fifth President (2018 to 2019).

11. On October 12, 2020, Francis Collins, the former Director of the NIH, appointed Dr. D'Souza to the position of Director, National Institutes of Dental and Craniofacial Research, National Institutes of Health ("NIDCR"). She was the first Asian woman and the first woman of color to head one of NIH's 20 Institutes since NIH's founding in 1887.

12. As Director of NIDCR, Dr. D'Souza oversees an annual budget of more than five hundred million dollars. NIDCR supports basic, translational, and clinical research in areas of head and neck cancer, orofacial pain, tooth decay, periodontal disease, salivary gland dysfunction, craniofacial development and disorders, and the oral complications brought about by systemic diseases. D'Souza also maintains an active research program in the National Institute of Child Health and Human Development (NICHD).

13. Dr. D'Souza has flawlessly executed her duties as a senior leader of NIH and, without fail, she has championed the policies and values that are at the heart of NIH's mission. NIDCR could not have achieved such success in a short period of time (2 years and 10 months) without the team spirit that Dr. D'Souza has fostered and the dedication she has shown. Dr. D'Souza has ensured accountability and upheld

high standards of performance and conduct for all employees at NIDCR. The high level of collegiality that she has modeled is exemplified in the progress NIDCR has made as it celebrates the 75th anniversary year of its founding in 1948.

14.  Throughout her tenure at NIH, Dr. D'Souza has established highly collegial interactions with NIH's leaders and staff. She has represented NIH and NIDCR well in highly controversial matters that involved public health impact and nationwide significance, such as community water fluoridation. Dr. D'Souza is active on and leads several NIH-wide committees including the UNITE's 'E' subcommittee. She also chairs the Women of Color Committee, the Working Group on Policy Implementation for the Clinical Trial Stewardship Workforce, and the Executive Committees for HEAL and NIH's Pain Consortium. More recently, she co-chairs the Search Committee for the Director of the Fogarty International Center alongside Dr. Eliseo Perez-Stable. In recognition of her service on UNITE's 'E' subcommittee, Dr. D'Souza received the NIH Director's Award two years in a row (2021 and 2022).

15.  Under Dr. D'Souza's leadership, NIDCR has launched an unprecedented number (five) of major research collaboratives involving partnerships with other NIH Institutes and Centers. As a result of Dr. D'Souza's hard work, ties with key stakeholders, along with federal partners, are now the strongest recorded in NIDCR's 75-year history.

16.  As an internationally recognized researcher Dr. D'Souza was awarded the 2023 Distinguished Scientist Award from the International Association for Dental Research ("IADR") for significant contributions in the fields of craniofacial development and genetics. This is the second time she has been recognized by IADR, which is a rare feat.

17. Although Dr. Collins was Dr. D'Souza's first-line supervisor of record, he delegated day-to-day supervision of Dr. D'Souza to the Principal Deputy Director, Dr. Lawrence Tabak, an American-born white male, and former Director of NIDCR (2000 to 2010). Dr. Collins left the Director position on December 21, 2021, and the Secretary of the Department of Health and Human Services appointed Dr. Tabak as Acting Director of NIH until the President of the United States appointed a permanent director of NIH. Dr. Tabak currently serves in the Acting Director position and will do so until the current nominee for the position, Monica Bertagnolli, M.D., is confirmed by the United States Senate.

18. Dr. D'Souza's outstanding performance was documented in her two performance appraisals, both of which were completed and signed by Dr. Tabak. During her first year as the NIDCR Director (10/1/2020 to 9/30/21), Dr. Tabak gave Dr. D'Souza a rating of five in all but one of the 5 critical elements (Leading Change, Leading People, Building Coalitions and Results Driven). Dr. Tabak gave her a 4 in "Business Acumen," which led to an overall rating of 4.75 out of 5.0. Dr. Tabak wrote that Dr. D'Souza "create[ed] a positive workplace culture," at NIDCR and fostered a work environment that "encouraged creative thinking, collaboration, and transparency.…" He further wrote that under Dr. D'Souza's leadership, "a framework was developed to improve the culture" of NIDCR, including putting in place systems to "better understand employee needs and concerns." Similarly, He praised Dr. D'Souza for advancing NIDCR diversity, equity, and inclusion by facilitating a plan to engage and train the NIDCR community "through discussions around social and racial injustice, systemic racism, and other key workplace issues."

19. On October 11, 2022, Dr. Tabak completed and signed Dr. D'Souza's fiscal year 2022 (10/1/2020 to 9/30/2021) Performance Appraisal, which was again outstanding. Dr. Tabak gave Dr. D'Souza a rating of five on four out of five on all critical elements except "Leading People," for which she was given a rating of three, which brought her overall rating to 4.6 out of 5.0.

20. Following his appointment to the Acting Director position, Dr. Tabak non-competitively selected Dr. Tara Schwetz to be the Acting Principal Deputy Director. Dr. Schwetz is a Caucasian Female who was born in the United States. Dr. Tabak supervised Dr. D'Souza directly and through Dr. Schwetz.

21. As Dr. D'Souza's formal supervisor, Dr. Tabak is responsible for completing and signing Dr. D'Souza's Annual Performance Appraisal as part of the HHS Senior Executive Performance Management System. These annual ratings are used to make career advancement decisions and decisions about the amount of annual performance bonuses.

22. At NIH, Dr. Tabak has exhibited a pattern of turning a blind eye toward gender discrimination, particularly when the discrimination is against women of color, yet when it comes to women in general, he holds them to a completely different standard. Since at least 2021, NIH has been the subject of an investigation by the House Committee on Energy and Commerce (the "Committee") on allegations that NIH failed to take adequate steps to investigate sexual harassment complaints involving extramural grantees under NIH's oversight and to ensure discipline against the harassers. Numerous letters were sent to Dr. Tabak demanding that NIH take accountability and step-up efforts to combat sexual harassment and bullying of female staff. Those letters highlight the pervasive culture of sexual harassment and bullying at NIH with many complaints going unanswered and responsible officials allowed to continue without any

accountability. Notably, in a letter dated August 11, 2022, the Committee highlighted that NIH's own statistics show more than 300 cases related to harassment from 2018 to August 2022. The Committee found that NIH's actions to date to address the issue have been "not adequate to ensure a safe and functional biomedical research workplace given the apparent scale of the challenge." The Committee requested that NIH provide information regarding its process for investigating harassment complaints. The Committee's August 11, 2022, letter went unanswered by Dr. Tabak, and the Committee renewed its request for the information on March 14, 2023.

### DR. TABAK'S FAVORABLE TREATMENT OF A MALE WHO COMMITTED DISCRIMINATORY ACTS AND GAVE FALSE TESTIMONY UNDER OATH

23. Dr. Tabak also recently treated another Senior Manager who is a Caucasian Male (Dr. Robert Eisinger) very differently than he did Dr. D'Souza by hiring him in a Senior Management position in July 2022 and allowing his career at NIH to thrive, despite the fact that in 2019, an Equal Employment Opportunity Commission ("EEOC") Administrative Judge ruled that Dr. Eisinger committed a discriminatory and retaliatory act when he terminated an African-American Female subordinate and gave false testimony under oath in an EEO adjudicative proceeding in which the finding was made.

24. From July 1, 2015, to July 10, 2016, Dr. Eisinger served in the dual position of Acting Director of the Office of AIDS Research and Acting Associate Director of AIDS Research (collectively referred to as "Director of OAR"). He reported to Dr. James Anderson, who was then Director of the Division of Program Coordination, Planning, and Strategic Initiatives ("DPCPSI") and one of four Deputy Directors of NIH. At the time, Dr. Anderson reported to the Director of NIH, Francis Collins. However, Dr. Tabak was Principal Deputy Director of the NIH and had delegated supervisory authority (granted by Dr. Collins) over Dr. Anderson. And in that capacity,

Dr. Tabak was fully aware of the decision by the Administrative Judge finding that Dr. Eisinger had committed a discriminatory and retaliatory act.

25. In July of 2016, Dr. Eisinger was non-competitively reassigned to the position of Special Advisor to Dr. Anthony Fauci, the Director of the National Institute of Allergy and Infectious Diseases ("NIAID").

26. On August 30, 2019, while Dr. Eisinger served as Dr. Fauci's Special Advisor, and following an adjudicatory trial-type hearing before an Administrative Judge of the Equal Employment Opportunity Commission, the Judge ruled that Dr. Eisinger had terminated the Black Female for discriminatory reasons – based on her race (African American), her gender (female) and in retaliation for filing a discrimination complaint naming him as the responsible management official. The Administrative Judge also concluded that, while under oath, Eisinger did not give truthful testimony. In this regard, the Administrative Judge wrote: "he [Eisinger] was making it up as he was testifying on this point" and "[h]e was not being truthful." The Administrative Judge recommended that the NIH consider discipline against Dr. Eisinger. The NIH then adopted the Administrative Judge's decision as its own, including the recommendation that Dr. Eisinger be disciplined. However, it does not appear that Dr. Tabak or Dr. Collins ever disciplined him for the discriminatory and retaliatory acts that he committed.

27. In his role as Principal Deputy Director of the NIH (which he held from 2010 to December 2021 when he became Acting Director of NIH), Dr. Tabak learned of the Administrative Judge's decision regarding Dr. Eisinger and NIH's adoption and acceptance of the decision.

28. Despite the Administrative Judge's decision, Dr. Eisinger remained Special Advisor to Dr. Fauci until sometime in 2021 when he became Special Advisor to Dr. James Anderson. At that point, Dr. Eisinger was within Dr. Tabak's chain of command.

29. In April of 2022, almost three years after the Administrative Judge's decision, Dr. Eisinger voluntarily ended his employment at the NIH by retiring. Despite Dr. Eisinger's proven record of discrimination and false testimony under oath, which was known by Dr. Tabak, Dr. Tabak re-hired Dr. Eisinger on July 1, 2022, in a Senior Management position at NIH. Dr. Tabak non-competitively appointed Dr. Eisinger to the dual positions of Acting Deputy Director for Program Coordination, Planning and Strategic Initiatives and Acting Director of DPCPSI, Dr. Anderson's former position. Dr. Eisinger occupies these dual positions in an acting capacity to this day.

30. In his Acting Director positions Eisinger reported directly to Dr. Tabak. And with the approval of, encouragement from, and at the direction of Dr. Tabak, Dr. Eisinger has harassed high-level NIH female Senior Managers, including, but not limited to, making baseless criticisms of their performance, and accusing them of misconduct or mismanagement.

31. Dr. D'Souza and Dr. Eisinger were similarly situated in that both were Senior Managers, and both were under Dr. Tabak's supervisory authority. However, Dr. Tabak treated them completely differently. Dr. Tabak directed and approved Dr. Schwetz's severe disciplinary actions against Dr. D'Souza, based on ridiculous trumped-up allegations of mistreatment of subordinate employees. Dr. Tabak's goal was to remove Dr. D'Souza from position as Director of NIDCR prior to the time that Dr. Tabak would be reassigned to NIDCR (*i.e.* when the Senate confirms a Permanent Director of NIH), while simultaneously allowing Dr. Eisinger's career to thrive despite his prior record of discrimination against females and false statements given under oath.

32. It was clear that Dr. Tabak intended to return to NIDCR, where he served as Director from 2000 to 2010, after a Permanent Director of NIH was confirmed by the United States Senate. In fact, Dr. D'Souza signed a Memorandum of Understanding in May or June 2023, which required NIH to assign Dr. Tabak as a Tenured Principal Investigator position in NIDCR, after his term as Acting Director ended.

## THE PATTERN OF HARASSMENT AND DISCRIMINATORY CONDUCT

33. In the fall of 2022, Dr. Schwetz and Dr. Tabak, acting in concert, began embarking on a pattern of harassment of Dr. D'Souza based on discriminatory motives, by taking steps to ensure that Dr. D'Souza would either be removed from her position involuntarily based on false or trumped-up charges or that she would voluntarily resign because of the harassment by Dr. Schwetz and Dr. Tabak.

34. On October 14, 2022, Dr. Schwetz, acting with the full knowledge of and at the direction of Dr. Tabak, informed Dr. D'Souza verbally that she would be issuing a notice of proposed 3-day suspension. That was part of a pattern of harassment that was both severe and/or pervasive.

35. On October 21, 2022, Dr. Schwetz issued a written notice of the proposed three-day suspension, which was unheard of for a Manager at Dr. D'Souza's level. Then on December 7, 2022, the Agency made a decision to suspend Dr. D'Souza for two days. The notice and decision were part of a pattern of harassment that was both severe and/or pervasive.

36. With Dr. Tabak's approval and support, Dr. Schwetz falsely accused Dr. D'Souza of making inappropriate statements to her subordinates and engaging in conduct unbecoming a federal supervisor. The complaints underlying the suspension were made by subordinates of Dr. D'Souza who opposed Dr. D'Souza's efforts to make much-needed reforms within NIDCR. In

fact, Tabak and Schwetz discriminatorily singled out Dr. D'Souza for making statements like those made primarily by other white male supervisors at NIDCR but had not been subject to any disciplinary action.

37. Specifically, the proposal to suspend recited 11 instances of making inappropriate statements to subordinates. One of the categories of inappropriate statements Dr. D'Souza allegedly made is using race as a descriptive term. However, Dr. D'Souza did so in the context of conversations about racial diversity and inclusion at NIH, which as Director of NIDCR, is one of her responsibilities to foster and promote.

38. Another category of inappropriate statements includes those concerning the personal life of two of Dr. D'Souza's subordinates. These statements, to the extent made by Dr. D'Souza, were not derogatory or mean-spirited, and were made in course of conversation, initiated by the subordinates, where the subordinate volunteered personal information far beyond that which was appropriate in the workplace. The same type of statements that Dr. D'Souza was being reprimanded for making had been made by other staff at NIDCR without consequence and without anyone ever having complained about it. Moreover, some of the allegations are blatantly false because Dr. D'Souza never made the statement at issue.

39. The allegations that Dr. D'Souza engaged in conduct unbecoming a federal supervisor is based on claims that she discouraged or intimidated a subordinate from complaining about her outside the chain of command, including using the NIH Civil Process, EEO Process, or the Ethics Office. These claims are overblown, frivolous and largely duplicative of one another as they arise out of an ongoing dispute with a single recalcitrant subordinate who disagreed with Dr. D'Souza's decision to have a long-time NIH partner organization conduct a webinar on a significant oral health status report issued by NIDCR. Dr. D'Souza did not retaliate or discourage

any subordinate from using any available means of conflict resolution, including the NIH Civil process or the EEOC. Rather, as she has done during her entire tenure as Director, she promoted her open-door policy of being available during and after work hours to discuss any issues or concerns that any of her subordinates had. However, her statements were taken out of context and misconstrued to manufacture a justification to suspend her from duty.

40. Moreover, Tabak and Schwetz denied Dr. D'Souza any meaningful opportunity to rebut, clarify or explain some of the allegations which formed the basis for the suspension. Evidence and testimony which was favorable to Dr. D'Souza, and would have rebutted the allegations made against her, was not provided to the NIH Civil Complaint Department (which investigates harassment complaints).

41. Dr. Tabak completely ignored far more egregious conduct from Dr. Eisinger. In July 2022, several months before he started taking steps to push Dr. D'Souza out of the NIH, he made the decision to non-competitively re-hire Dr. Eisinger despite his knowledge that after a full-blown EEOC hearing before an Administrative Judge, the Judge found that Dr. Eisinger had discriminated against a Black Female by terminating her and that during that proceeding, he made false statements under oath.

42. On December 12, 2022, Dr. D'Souza filed an informal complaint identifying the performance rating and the two-day suspension as discriminatory acts. Dr. D'Souza named Dr. Schwetz as responsible management official (signing official) and alleged that she was discriminated against based on race (Asian), sex (female), national origin (Asian, Indian), and color (brown).

43. On February 14, 2023, Dr. D'Souza filed her formal complaint identifying performance rating and two-day suspension as discriminatory acts.

44. On April 25, 2023, the Agency served Dr. D'Souza with a verbal notice of her proposed 14-day suspension. On April 28, 2023, the Agency served Dr. D'Souza with a written notice of proposed 14-day suspension. That was part of a pattern of harassment that was both severe and/or pervasive.

45. On July 17, 2023, following Dr. D'Souza's lengthy rebuttal refuting each and every charge, the Agency issued a decision suspending Dr. D'Souza for 14 days. The 14-day suspension was equally baseless and part of an effort by Tabak to expel Dr. D'Souza from the Agency before his Acting Director position ended and he would be reassigned to Dr. D'Souza's unit.

46. On July 25, 2023, Dr. D'Souza amended her discrimination complaint by adding the 14-day suspension claim. That was both an adverse action and part of a pattern of harassment that was both severe and/or pervasive.

47. However, with regard to the proposed 14-day suspension and the decision to suspend Dr. D'Souza for 14-days, Dr. D'Souza is not making those claims at this time in this Complaint because the administrative exhaustion process has not yet been completed and those claims are not yet ripe for adjudication in this Court. The process will be completed within 180 days of the time Dr. D'Souza amended her complaint to add each of those claims. Dr. D'Souza amended her administrative complaint to add the proposed 14-day suspension claim on May 3, 2023, and that claim will ripen on October 30, 2023. Dr. D'Souza amended her administrative complaint to add the suspension claim on July 25, 2023, and that claim will ripen on January 21, 2024. Dr. D'Souza will amend her Complaint in this case once those claims ripen.

48. On August 17, 2023, Dr. Tabak inappropriately and in a demeaning manner, berated Plaintiff at a meeting which was attended by approximately 60 persons, 30 of whom were present in the room and 30 of whom were virtual.  The meeting was attended by all NIH institute

and center Directors. At around 9:30 a.m. on that date, during a presentation on diversity, Plaintiff engaged in protected EEO activity by pointing out that researchers of Chinese descent within and outside of NIH were feeling stigmatized and targeted and that NIH should address their concerns. Tabak showed his discriminatory animus toward Plaintiff by yelling and banging his fist on the table screaming that NIH does not target anyone. This was embarrassing and humiliating for Plaintiff and many of those in the room were shocked. Tabak later sent Plaintiff and the other Directors a disingenuous apology, in which he continued to dispute that Chinese researchers were being targeted and stigmatized. This claim is not yet ripe for inclusion in a judicial complaint, but once Plaintiff exhausts her administrative remedies on this allegation, she will amend the complaint to add.

## COUNT I

### (DISCRIMINATION IN VIOLATION OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED)

49. Paragraphs 1-48 of this Complaint are hereby incorporated by reference.

50. The Agency violated Title VII of the Civil Rights Act of 1964 by discriminating against Dr. D'Souza based on her race (Asian), gender (female), national origin (Asian, Indian), and color (brown).

51. The Agency committed the following acts of discrimination, which are either adverse actions or materially adverse actions: on December 7, 2022, it issued a final determination on the notice of proposed suspension and suspended Dr. D'Souza from duty for 2 days.

52. On July 11, 2023, the Agency suspended Dr. D'Souza for 14 days. However, Dr. D'Souza is not making this claim a part of the case at this time because the administrative exhaustion process has not yet been completed. The process will be completed within 180 days of the time Dr. D'Souza amended her administrative complaint to add the 14-day suspension claim,

14

which will be on January 23, 2024. Dr. D'Souza will amend her Complaint to include the 14-day suspension as an additional adverse action after January 23, 2024.

53. Dr. D'Souza plans to present evidence and prove her claims under two alternative legal theories. Dr. D'Souza will proceed under the three-part evidentiary framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Dr. D'Souza will alternatively proceed under the mixed motive evidentiary framework set forth in 42 U.S.C. § 2000e-2(m) and *Price Waterhouse v. Hopkins*, 490 U.S. 228, 250 (1989).

54. Dr. D'Souza intends to demonstrate that her race (Asian), sex (female), national origin (Asian, Indian), and color (brown), were determinative factors in the decision to take the adverse actions against her or alternatively, they were motivating factors in the decision.

55. Dr. D'Souza suffered humiliation, embarrassment, psychological and emotional harm, severe emotional and psychological distress, and damage to her career as a result of the Agency's discrimination.

56. Dr. D'Souza exhausted her administrative remedies as to the claim in ¶ 50 above.

WHEREFORE, Dr. D'Souza requests the following relief: (a) such compensatory damages as a jury might award; (b) such economic damages as a jury or the Court might award; (c) attorney's fees and costs; (d) expungement of her records removing the 2-day suspension and supporting materials from her personnel file; and (e) any other relief the Court deems appropriate.

## JURY DEMAND

Dr. D'Souza demands a trial by jury on all issues triable to a jury as a matter of right.

        Respectfully submitted,

        /s/ Omar Vincent Melehy
        Omar Vincent Melehy, Esq.
        MD Bar No. 05712
        MELEHY & ASSOCIATES, LLC
        8403 Colesville Rd., Suite 610
        Silver Spring, MD 20910
        Phone: (301) 587-6364
        Fax:    (301) 587-6308
        Email: ovmelehy@melehylaw.com
        *Counsel for Plaintiff*